LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
JOSHUA L. CROWELL (#295411)
LEANNE H. SOLISH (#280297)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:   (310) 201-9160
Email:       lglancy@glancylaw.com
             rprongay@glancylaw.com
             jcrowell@glancylaw.com

*Attorneys for Lead Plaintiff*
[Additional Counsel Listed On Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Intrexon Corporation Securities Litigation | Case No. 3:16-cv-02398-RS |
| | **CLASS ACTION** |
| | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................................. 1

II.  JURISDICTION AND VENUE ............................................................................... 4

III.  PARTIES ................................................................................................................ 4

IV.  BACKGROUND ....................................................................................................... 6

    A.  Intrexon's Business ........................................................................................ 6

    B.  Intrexon's Public Stock Offerings .............................................................. 7

V.  Intrexon's Fraudulent and Deeply Flawed Business Model ........................... 8

    A.  Intrexon's Empty Suite of Core Technologies ........................................... 9

        1.  UltraVector, RheoSwitch, and AttSite Recombinases ............................... 10

        2.  Cell Systems Informatics and Laser-Enabled Analysis and Processing ..... 13

        3.  Other Discredited Technologies ................................................................. 14

        4.  High Scientist Turnover ............................................................................. 16

    B.  The Failure of Intrexon's CAR-T Collaborations .................................... 17

    C.  Intrexon's Reliance on Microcap Companies and Round-Tripping Revenues ....... 18

    D.  Krishnan's Sudden Resignation .................................................................. 21

VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................................................... 21

    A.  Defendants' Material Misrepresentations and Omissions In Announcing Intrexon's 1Q 2015 Financial Results .............................................................. 21

    B.  Defendants' Material Misrepresentations and Omissions In Announcing Intrexon's 2Q 2015 Financial Results .............................................................. 25

    C.  Defendants' Material Misrepresentations and Omissions In Intrexon's August 2015 Public Offering Prospectus ................................................................. 27

    D.  Defendants' Material Misrepresentations and Omissions In Announcing Intrexon's 3Q 2015 Financial Results .............................................................. 28

E. Defendants' Material Misrepresentations and Omissions In Intrexon's November 2015 Public Offering Prospectus ................................................................... 29

F. Defendants' Material Misrepresentations and Omissions In Intrexon's December 2015 Public Offering Prospectus ................................................................... 30

G. Defendants' Material Misrepresentations and Omissions In Announcing Intrexon's 4Q 2015 and FY 2015 Financial Results ..................................................... 31

H. Defendants' Other Material Misrepresentations and Omissions Concerning its RheoSwitch Technology ........................................................................... 34

VII. LOSS CAUSATION ................................................................................................ 35

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........................................................................................................... 37

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ............................................................................................................. 39

X. CLASS ACTION ALLEGATIONS ........................................................................ 39

XI. CLAIMS FOR RELIEF ........................................................................................... 41

XII. PRAYER FOR RELIEF ........................................................................................... 44

XIII. JURY DEMAND ...................................................................................................... 44

1.     Lead Plaintiff Joe Seppen ("Plaintiff"), by and through his undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of Intrexon Corporation ("Intrexon" or the "Company") from May 11, 2015, through April 27, 2016, inclusive (the "Class Period").

2.     Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of court-appointed Lead Counsel Glancy Prongay & Murray LLP. This investigation included, among other things, a review and analysis of: (i) Intrexon's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Intrexon's investor calls; (vi) interviews with former employees and other potential witnesses with relevant information; and (vii) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.     PRELIMINARY STATEMENT

3.     Intrexon is a self-described leader in the field of synthetic biology, or the engineering and fabricated design of biological systems and organisms to improve applications of these systems and organisms for either biological research or for industrial purposes.

4.     With Intrexon's eighteen (18) years of experience in designing, modifying, and regulating gene programs – DNA sequences that control cellular processes – the Company has touted its supposed advantage in applying synthetic biology at an industrial level in numerous sectors including: healthcare, and in particular, rare and infectious diseases and oncology; food, such as genetically modified salmon and apples; energy, particularly isobutonal; and environmental science.

5. Intrexon is able to design, modify, and regulate these gene programs with is "core technology suite" of tools to assist in the engineering of cells and organisms. Intrexon commercializes its tools and "leadership" in the field by entering into various collaborations across the wide array of sectors listed above to develop a certain product or products.

6. Most of these collaborations are structured as an "exclusive channel collaboration" ("ECC" or "ECCs"). Although not as common, Intrexon's collaborations may take the form of a joint venture, in which Intrexon contributes access to its services and technologies and/or cash, and could be required to contribute additional capital as needed, in exchange for joint control and higher potential financial returns upon a successful development of a novel product.

7. In an ECC, the collaborator and Intrexon agrees to develop a product or product(s) in a defined field using Intrexon's technologies. The collaborator receives exclusive rights to use the Company's expertise and technologies within that defined field. In return, the ECC agreement provides Intrexon with four types of payments: (1) technology access fees upon signing; (2) reimbursement of Intrexon's research and development costs; (3) milestone payments when specified achievements are reached; and (4) royalties from the collaborations commercialized product.

8. Intrexon's heavily relies on this ECC model, and until 2015 (shortly after the Company acquired a company providing bovine reproductive technologies that provided diversified revenues for Intrexon), the revenues from the collaboration and licensing of Intrexon's core technologies was nearly the entire business. Defendants stressed to investors that its ECC model allowed Intrexon to have many shots on goal over a wide range of products and fields using its products and their collaborators expertise in the particular field – and thus spreading and limiting the risk of any one unsuccessful use of Intrexon's technologies.

9. Defendants, sold Intrexon's unique story with countless, inflated press releases, presentations, and media interviews. Intrexon's Chief Executive Officer ("CEO") and Chairman of the Board, Defendant Randal J. Kirk ("Kirk"), was also the Company's biggest salesman of the Intrexon story. The key to this story was the strength of the Company's core technology suite. Along with the story came multiple stock offerings and a soaring market capitalization: the currency for Intrexon's many acquisitions.

10. In reality however, Defendants hype was nothing but hot air. On April 21, 2016, the analyst firm Spotlight Research released the first part of its eight-part report on Intrexon (together, the "Spotlight Report")[1] on the widely used financial website Seeking Alpha. A week later on April 27, 2016, parts two through eight were released on the same website. In the executive summary accompanying the first part, the Spotlight Report likened Intrexon to the "Theranos of the public markets" and concluded that "Intrexon has been around for more than 17 years and commercialized effectively zero meaningful commercial products using its own technology."

11. The Spotlight Report revealed that the "core technology suite" key to Intrexon's numerous collaborations consisted of "overhyped, undifferentiated collection of commodity and failed products," that failed to provide much value. Confidential witnesses confirm the commodity nature of Intrexon's main technology, UltraVector, the failure of another, RheoSwitch to work as described, and the Company's disinterest in retaining talent that could lay the path to successful partnerships.

12. As a result, Intrexon had trouble attracting large, credible partners. Instead, Intrexon has collaborated with, as the Spotlight Report framed it, "failed/failing and/or shady microcaps that have no other options." Even so, these companies were not incentivized to partner with Intrexon based on the promise of exclusive use of Intrexon's core technologies, but rather for the immediate cash Defendants injected into these struggling microcaps. Eventually, this cash made a "round-trip" back to Intrexon in form of collaboration and licensing revenues.

13. To drive home its point, the Spotlight Report highlighted that one of Intrexon's core technologies had such little value that it was given away by its previous owner. This technology was Intrexon's RheoSwitch – a gene switch that, according to a confidential witness that worked with the technology, did not work properly. During the Class Period, Defendants both hyped and tied up the Company's resources in collaborations to develop and commercialize Chimeric Antigen Receptor T-cell ("CAR-T") cancer therapies largely using the RheoSwitch technology.

14. The Spotlight Report revealed to investors that Intrexon's ECC business model was fatally flawed due to its weak portfolio of core technologies, and that any meaningful revenue and

---

[1] Part one of the Spotlight Report is attached hereto as Exhibit A. Parts two through eight of the Spotlight Report are attached hereto as Exhibit B.

earnings growth would need to come from Intrexon's concentrated product and services revenue. As a result of this news, Intrexon's stock fell approximately 26%, or $9.73 on April 21, 2016 when the executive summary and part one of the Spotlight Report was released. The Company's stock further dropped an additional 13%, or $3.57, during the day on April 27, 2016 when the remainder of the Spotlight Report was published.

## II.      JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Intrexon conducts business and maintains a division and operating unit in this District.

18.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.      PARTIES

19.     On July 25, 2016, the Court appointed Joe Seppen as Lead Plaintiff. Plaintiff, as set forth in a previously-filed PSLRA certification (Dkt. No. 28-2), incorporated by reference herein, purchased Intrexon securities during the Class Period and suffered damages as a result of the violations of federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

20.     Defendant Intrexon is a company incorporated under the laws of Virginia and headquartered in Germantown, Maryland. It maintains operations in Germantown, Maryland; Davis, California; San Diego, California; South San Francisco, California; Blacksburg, Virginia; West Palm Beach, Florida; Budapest, Hungary; and Ghent, Belgium. Intrexon's common stock trades under the ticker symbol "XON" on the New York Stock Exchange (the "NYSE"), which is an efficient market.

21. Defendant Randal J. Kirk ("Kirk") has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors throughout the Class Period. In addition, Kirk currently serves as the Senior Managing Director and CEO of the investment management firm he founded in 1999, Third Security, LLC, and is a member of the board of directors for Halozyme Therapeutics, Inc. and ZIOPHARM Oncology, Inc. ("Ziopharm"). Previously, Kirk founded and became Chairman of the Board of New River Pharmaceuticals Inc., and was President and Chief Executive Officer between October 2001 and April 2007. Kirk also served as a member of the board of directors of Scios, Inc. between February 2000 and May 2002.

22. Throughout the Class Period, Kirk spoke frequently to investors and analysts on conference calls. Kirk possessed the power and authority to control the contents of the Company's public filings with the SEC. He signed and certified the accuracy of Intrexon's Forms 10-K for the fiscal years ended December 31, 2015, and certified the accuracy of Intrexon's Forms 10-Q for each quarterly period from March 31, 2015 through September 30, 2015. Additionally, he signed Form S-3ASR filed with the SEC on September 5, 2014.

23. Defendant Rick L. Sterling ("Sterling") was, at all relevant times, the Chief Financial Officer ("CFO") of Intrexon. Kirk possessed the power and authority to control the contents of the Company's public filings with the SEC. He signed and certified the accuracy of Intrexon's Forms 10-K and 10-K/A for the fiscal years ended December 31, 2015, and Forms 10-Q for each quarterly period from March 31, 2015 through September 30, 2015. Additionally, he signed Form S-3ASR filed with the SEC on September 5, 2014.

24. Defendant Krish S. Krishnan ("Krishnan") was, through the vast majority of the Class Period, the Chief Operating Officer ("COO") of Intrexon. Krishnan also served as the Senior Managing Director, COO, and Director of Business Development and Strategy of Third Security LLC, and served as COO, CFO, and Secretary of New River Pharmaceuticals Inc. since April 2004 and also served as its Principal Accounting Officer. Throughout the Class Period, Krishnan spoke frequently to investors and analysts on conference calls.

25. Defendants Kirk, Sterling, and Krishnan are collectively referred herein as the "Individual Defendants."

## IV.  BACKGROUND

### A.  Intrexon's Business

26.  Intrexon describes itself as "a leader in the field of synthetic biology, an emerging and rapidly evolving discipline that applies engineering principles to biological systems to enable rational, design-based control of cellular function for a specific purpose." There is no one definition of synthetic biology, but in general, it can be described as the engineering and artificial design of biological systems and organisms for the purpose of improving applications for biological research and/or industry.

27.  Intrexon has over eighteen years of experience in designing, modifying, and regulating gene programs, which are DNA sequences that control cellular processes. The Company applies synthetic biology at an industrial scale to multiple high-potential verticals within healthcare (oncology, rare and infectious diseases, animal health), food (aquaculture, GM crops), energy (isobutanol) and environmental science (biological versions of chemical pesticides).

28.  The heart of the Company is its supposed "core technology suite," which primarily consists of molecular biology tools to assist in the engineering of cells and organisms. Intrexon explains that its business model is to commercialize these technologies through various collaborations. Because these technologies are apparently broadly applicable, Intrexon has been able to form collaborations across a diverse number of markets including in the health, food, energy, environment, and consumer sectors. Defendants have described this business model as a "shots on goal" approach.

29.  These collaborations mostly take place through the formation of an ECCor, in certain circumstances through joint ventures. Generally, in an ECC, Intrexon and the collaborator agree to develop a product (or products) using Intrexon's technologies in a defined field. This field may be defined narrowly, such as a specific therapeutic approach for a single indication, or may be defined broadly, such as an entire class of related products. Intrexon grants the collaborator exclusive rights to use its services and technologies to commercialize the product or products within the defined field of the ECC.

30.  Alternatively, Intrexon may enter into a joint venture with a collaborator. In these circumstances, Intrexon will contribute access to its technologies, cash, or both to the joint venture,

and may be required to contribute additional capital to the venture as needed. In a joint venture, Intrexon has joint control with its collaborator. Intrexon further explains that it may be able to receive higher financial returns than it would normally receive from an ECC upon the successful development of a product or products.

31. Under an ECC, Intrexon realizes revenue in four general categories: (i) technology access fees upon signing; (ii) reimbursements of research and development costs; (iii) milestone payments upon specified achievements; and (iv) royalties from commercialized products arising from the collaboration. However, Intrexon has received equity in lieu of cash for owed technology fees and milestone payments. Intrexon generally refers to these revenues as "collaboration and licensing revenues."

32. In addition, the Company realizes "products and services revenue" primarily relating to Intrexon's 2014 acquisition of Trans Ova Genetics, a company that provides bovine reproductive technologies such as the sale of pregnant cows and livestock and the provision of in vitro fertilization and embryo transfer services. In 2015, products and services revenues comprised approximately 35% of total revenues.

33. Intrexon was founded in 1998 by Thomas D. Reed, who is now the Chief Science Officer. When the Company moved to Blacksburg, Virginia, in 2004, Kirk took notice. He and his investment firm, Third Security, invested $300 million and assumed control of Intrexon. Even after the Company went public in 2013, Kirk maintains control.

34. As stated in Intrexon's 2015 Form 10-K: "We have historically been controlled, managed and principally funded by Randal J. Kirk, our Chief Executive Officer, and affiliates of Mr. Kirk. As of December 31, 2015, Mr. Kirk and shareholders affiliated with him beneficially owned approximately 53 percent of our voting stock. Mr. Kirk is able to control or significantly influence all matters requiring approval by our shareholders, including the election of directors and the approval of mergers or other business combination transactions."

**B. Intrexon's Public Stock Offerings**

35. Intrexon completed its initial public offering of stock on August 13, 2013, selling 11,499,998 shares at a public offering price of $16.00 per share, resulting in net proceeds of $168.3

million. J.P. Morgan Securities LLC and Barclays Capital Inc. acted as joint book-running managers for the offering.

36. On January 27, 2015, Intrexon closed a secondary public offering of 4,312,500 shares of common stock at a public offering price of $27.00 per share, resulting in net proceeds of $110.0 million. J.P. Morgan Securities LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated acted as joint book-running managers for the offering.

37. On August 26, 2015, Intrexon closed another secondary public offering of 5,609,756 shares of common stock at a public offering price of $41.00 per share, resulting in net proceeds of $218.2 million. In the offering, JMP Securities LLC acted as sole book-running manager, Stifel, Nicolaus & Company, Incorporated acted as lead manager, and Griffin Securities, Inc. and Wunderlich Securities, Inc. acted as co-managers.

## V. Intrexon's Fraudulent and Deeply Flawed Business Model

38. Intrexon's business relies heavily on the ECC model. In 2015, collaboration and licensing revenue accounted for approximately half of the Company's total revenue. Before 2015, collaboration and licensing revenue was substantially the Company's entire business. Unfortunately for investors, its ECC business model is a total sham.

39. The story sold to investors was this: Intrexon has a core suite of proprietary technologies, consisting primarily of widely applicable molecular biology tools for cell and organism engineering. The Company uses this suite to attract companies that would enter into ECCs or joint ventures with Intrexon. These ECCs and joint ventures will develop novel products that will be commercialized, allowing Intrexon to reap royalties without having to invest considerable money on research and development, clinical testing, and marketing. All Intrexon has to do is contribute its core technologies and expertise. This model allows Intrexon to have as many shots on goal as possible in a wide range of products and fields (*e.g.*, health care, energy, agriculture) while spreading and limiting the risk.

40. Defendants have sold this story with overblown press releases, presentations, and media interviews. This story fueled multiple stock offerings, including one during the Class Period, and a sky-high market capitalization, which acted as a currency for Intrexon's many acquisitions. The lynchpin to this story was the strength of the Company's core technology suite.

41.  As alleged in detail below, however, Intrexon's core technology suite was not differentiated and failed to provide much value. Unsurprisingly then, Intrexon has had difficulty attracting ECCs with large, credible partners but has instead collaborated with small, failing companies. Even then, what is attracting these microcap partners is not Intrexon's core technologies but financing. Through various channels, Defendants inject cash into Intrexon's struggling partners. Some of that cash then makes its way back to Intrexon in the form of collaboration and licensing revenue. For what purpose? To provide the illusion of revenue growth and to generate hype for collaborations reliant on strawmen technologies.

42.  In truth, Intrexon's ECC business model is fatally flawed due to the weak portfolio of core technologies. Any meaningful revenue and earnings growth will need to come from product and services revenue, which is now concentrated in a single acquired subsidiary, Trans Ova, whose business is bovine reproductive technologies. Therefore, Interxon's business entails much more risk than investors were aware of during the Class Period.

**A.      Intrexon's Empty Suite of Core Technologies**

43.  As the Spotlight Report would reveal at the end of the Class Period, Intrexon's core technology suite consisted of "overhyped, undifferentiated collection of commodity and failed products."

44.  Intrexon was able to get away with it, in large part, by abhorring transparency. As a *New York Times* article published on March 6, 2016 reported: "It is hard to judge the strength of Intrexon's core technology, known as UltraVector, which is a computerized system for putting together modular DNA pieces to make complex genetic circuits. The company, saying it wants to protect its trade secrets, has not published articles about it in scientific literature."

45.  Moreover, securities analysts are hardly well-versed in synthetic biotechnology. Thus, the following facts were not addressed by analysts before the end of the Class Period.

46.  According to Intrexon's corporate presentation, filed with the SEC on Form 8-K on the first day of the Class Period, the Company's "Integrated Technology Suite" includes the core technologies: UltraVector, RheoSwitch, and AttSite Recombinases. The presentation also mentions Cell Systems Informatics and Laser-Enabled Analysis and Processing ("LEAP"). This Complaint will

also address two other technologies included on Intrexon's website: mAbLogix antibody discovery and Endometrial Regenerative Cells.

### 1. UltraVector, RheoSwitch, and AttSite Recombinases

47. J.P. Morgan described UltraVector as follows: "UltraVector is a gene design and fabrication platform and its associated library of modular DNA components that allows for the translation of complex gene programs into standard components that can be designed, manufactured and tested in a robust, automated format. The computer-automated system utilizes construction rules to rapidly assemble and store DNA vectors in their component library, while the underlying algorithm is designed to determine the most efficient approach to assemble DNA regardless of complexity and scale." In addition, UltraVector incorporates technologies such as RheoSwitch and AttSite Recombinases, which "provide more precise control over genome integration and gene expression and regulation."

48. UltraVector is Intrexon's main technology. For example, Intrexon's May 2015 corporate presentation states, "Core technology: UltraVector® DNA design and fabrication." And in SEC filings, presentations, and analyst reports addressing the Company's core technologies, UltraVector is virtually always mentioned first. According to CW3, UltraVector was used as a main selling point when Intrexon approached an entity about a collaboration or partnership. CW3 was a Senior Scientist in the Animal Sciences division of Intrexon from September 2011 through July 2014, reporting to the Senior Director of Research. CW2 mainly worked on the Elanco project with Eli Lilly.

49. As the Spotlight Report revealed, however, UltraVector is a commodity technology, widely available and undifferentiated from many other vector technologies available on the market. In addition, based on Spotlight's examination of the 80 Intrexon patents listed in the U.S. Patent and Trademark Office ("USPTO") database, the original patent for UltraVector refers only to a standard DNA assembly, a commodity lab process done by inexpensive machines called DNA synthesizers. Intrexon has also touted its expansive database of vectors as a distinguishing factor for UltraVector. But as the Spotlight Report pointed out, many other vendors also have extensive vector libraries.

50. Former Intrexon scientists corroborate Spotlight's conclusion. CW1 was a scientist for Intrexon from April 2011 through August 2016. CW1 was an Associate Director in the Health Sector

group during the Class Period, reporting to Executive Director Vernon Dailey. According to CW1, many Intrexon personnel began using at least three different over-the-counter software packages for DNA constructs, instead of UltraVector, including Vector MTI and Genius.

51.     CW2 was a scientist for Intrexon from July 2011 through March 2014. CW2 was an Associate Director, Assay Development and Screening Operations in the Industrial Products division. Having done a significant amount of work with UltraVector, CW2 stated that it was a commodity technology that was widely available from other vendors. As CW2 observed, there are several DNA synthesis companies that set up databases and track DNA constructs. Such technology had become an outsource tool. In CW2's view, competing tools on the market were comparable to UltraVector.

52.     Nonetheless, to market UltraVector, Intrexon touted technologies that were incorporated into the UltraVector platform, the main ones being RheoSwitch and AttSite Recombinases. Intrexon's May 2015 corporate presentation states that RheoSwitch "provides inducible regulation of level and timing of gene expression." According to the Company's 2015 10-K, filed with the SEC on February 29, 2016, this "gene switch provides quantitative dose-proportionate regulation of the amount and timing of target protein generated, thereby providing another mechanism to closely control activity of a newly constructed gene program."

53.     The problem is that RheoSwitch failed to function adequately and consistently. CW1, who worked extensively with RheoSwitch, stated that it did not work as it should. The gene switch was supposed to work like a light switch that could be turned on and off. Instead, according CW1, RheoSwitch worked more like a dimmer switch; it turned the gene on, but it was difficult to turn the gene completely off. Because RheoSwitch was unreliable, Intrexon could not adequately control gene expression.

54.     It is no wonder that RheoSwitch did not work, given its provenance. As the Spotlight Report demonstrated, before being acquired by Intrexon in 2006, RheoSwitch had a long history as a failed technology that at one time was given away for a tax write-off. During the 1990s, it was owned by a firm called Rohm and Haas Company. In 1999, Rohm and Haas contributed it to a joint venture with a small biotech company called Argonex, Inc. The joint venture, called RheoGene, sought to develop mammalian applications for the technology in collaboration with major pharmaceutical and

biotechnology companies. Both RheoGene and Argonex failed within three years, with RheoGene failing to raise outside capital. Rohm & Haas then tried to find a buyer for the technology but could not do so. For this reason, on February 17, 2004, it was announced that Rohm and Haas had **_donated_** RheoGene to the University of Pittsburgh Medical Center.

55.  A Nature.com article dated March 25, 2004, reported that, "In the first move of its kind, an academic institution has 'spun in' a biotechnology company, acquiring all of its assets." The article further explained that: "[UPMC] announced on February 17 that it received the gene regulation firm RheoGene (Norristown, PA, USA) as a tax deductible gift of undisclosed value from RheoGene's parent company Rohm and Haas (Philadelphia, PA, USA). The donation, which includes intellectual property (IP), equipment, compounds, biological materials, research and commercial agreements and licenses, provides UPMC with key technology for its regenerative medicine research." RheoGene's CEO, Tom Tillett, explained in the article that the company had been struggling to raise capital since December 2002, when Rohm and Haas made a strategic decision not to pursue biotechnology.

56.  In December 2006, Intrexon announced that it would acquire RheoGene from UPMC for an undisclosed sum. Between the time that it was donated to UPMC and it was acquired by Intrexon, RheoGene had no partnerships or achievements to speak of, other than a $4 million grant from the Michael J. Fox Foundation for Parkinson's Research. In contrast, at the time that Intrexon acquired RheoGene, a technology similar to RheoSwitch was already in wide use – Argent by Ariad Pharmaceuticals, Inc. According to Ariad's Form 10-K filed on March 14, 2007, Argent had been licensed to several hundred academic institutions and several pharmaceutical and biotechnology companies. Argent gene switch products are available for less than $10,000.

57.  As for the other primary component, AttSite Recombinases, Intrexon's May 2015 corporate presentation describes it as "enabl[ing] genome engineering and delivery technologies for targeted gene integration plus expression." RheoGene also developed this technology, which was introduced in a RheoGene press release dated May 10, 2005. Attsite Recombinases refers to a recombinase called BxB1 integrase. The Spotlight Report notes that, according to an academic paper, BxB1 is not under patent and "there is freedom to operate" – *i.e.*, it is open source technology that is not exclusive to Intrexon.

## 2. Cell Systems Informatics and Laser-Enabled Analysis and Processing

58. J.P. Morgan described Cell Systems Informatics as follows: "Cell systems informatics permits faster design and efficient testing and learning of new gene targets or pathways. The platform enables the development of predictive computer models of biological systems providing a mechanism for high-throughput testing, rapid learning and examination of a large experimental space *in silico*." Intrexon's 2015 10-K states that this technology "uses statistical modeling and other analytic frameworks to determine the most efficient pathways for an intended biochemical result."

59. Intrexon acquired Cell Systems Informatics in 2011 by purchasing GT Life Sciences, Inc., according to an Intrexon press release dated October 11, 2011. Although Intrexon touted the technology as having a broad array of complex applications, the Spotlight Report revealed this as inaccurate. The Report included excerpts of GT Life Sciences marketing materials, which showed that the technology was really intended for mammalian cell line development, a much narrower purpose. Tellingly, the GT Life Sciences marketing materials did not mention any commercial achievements by the technology.

60. As stated in the Spotlight Report, according to the marketing materials, GT Life Sciences used "a metabolic modeling and experimental platform to drive the discovery and design of new products and processes." But GT Life Sciences did not own this software platform; called SimPheny, it was licensed from Genomatica, at the time a renewable feedstocks company with a mere $2.8 million of total revenue through the first nine months of 2011. Although SimPheny was being marketed as early as 2004, Genomatica had only $88,000 of licensing revenue through the first nine months of 2011. Genomatica filed papers to go public in 2011 but withdrew its initial public offering in 2012. Today, Genomatica's website does not even mention SimPheny.

61. Thus, as the Spotlight Report revealed, the value of the Cell Systems Informatics technology, based on rhw SimPheny platform, is extremely dubious. Indeed, when asked about Cell Systems Informatics, CW1 had never even heard of it.

62. J.P. Morgan described Laser-Enabled Analysis and Processing ("LEAP") as follows: "LEAP is an instrument that merges semiconductor manufacturing technologies for cell processing applications to provide high levels of control and scale to cell purification and stem cell culture

management. Capable of operating at the single cell level, LEAP can identify and purify cells of interest from large libraries created by the UltraVector platform." Intrexon's 2015 10-K states, "Once cells have been engineered for the desired biological output, the LEAP automated platform can be used to identify and purify cells of interest, such as antibody expressing cells and stem cells."

63. On October 11, 2011, Intrexon announced that it acquired LEAP by purchasing the assets from Cyntellect, Inc., a related party, for an undisclosed amount. As reflected in a press release dated July 25, 2007, Third Security (Kirk's investment fund) was an early major investor in Cyntellect. In fact, LEAP was an outdated, commodity machine used for standard cell screening whose technology dates back to before 2002.

64. Objective factors demonstrate that, prior to Intrexon's acquisition of Cyntellect's assets, LEAP had very little value in the marketplace. A 2006 valuation study paid for by Cyntellect projected total LEAP revenue of only $735,000 for all of 2006. The study also projected for 2006 an average net selling price of $368,000, a mere 3 unit sales, and an installed base of 2 units – and this is at least four years after LEAP technology had been developed. As stated in the Spotlight Report found, a center at Purdue University rents out LEAP machines for $31 to $68 per hour. Moreover, several companies offer similar machines, including GE Healthcare, Thermo Fisher Cellomics, and PerkinElmer.

### 3. Other Discredited Technologies

65. J.P. Morgan described mAbLogix as follows: "mAbLogix enables production of large B-cell libraries for discovery of antibodies, which have become increasingly important due to their use in anti-infectives and oncology. The process entails building human B-cell libraries expressing a large number of unique antibodies and the testing of these libraries based on analysis of B-cells that positively express antibodies in response to a specifically chosen antigen."

66. Intrexon acquired mAbLogix in 2011 through the purchase of Immunologix, Inc., according to an Intrexon press release dated October 24, 2011. An article published in *The Post and Courier* on October 29, 2011 reported that Immunologix went from "researching its technology" to being acquired by Intrexon in just 18 months, and in that time, Immunologix had raised only $1.1

million of capital. The founding CEO was about 28 years old at the company's inception, and before that he was the Licensing and Communications Manager at the Medical University of South Carolina.

67.    Immunologix licensed its technology from MUSC, and the company had no patent on the technology. The website of Immunologix stated that it had filed only a provisional patent, and Spotlight's search on the USPTO database returned no patents issued to Immunologix. That did not prevent Intrexon from falsely representing in its 2011 press release that Immunologix had a "patent license."

68.    As stated in the Spotlight Report, research indicated that Intrexon may have shut down the technology in 2013 and that it may never have worked. Indeed, according to CW1, mAbLogix never worked.

69.    As for Endometrial Regenerative Cells ("ERC"), Intrexon's website states: "[ERC] are universal donor adult-derived stem cells with the potential for providing clinical benefit in engineered cell-based therapies for conditions such as cancer, inflammation, and a number of orphan diseases. ERC are derived from the endometrium and are isolated through non-invasive methods. When combined with Intrexon's suite of integrated technologies, including UltraVector® gene engineering and expression control enabled by the RheoSwitch Therapeutic System® platform, engineered ERC have the potential to be employed as genetically modified vehicles for controlled delivery of therapeutic molecules."

70.    Intrexon acquired the ERC technology by purchasing failed microcap company Medistem, Inc. for $26 million in March 2014. The acquisition was announced in a press release on December 20, 2013. According to Medistem's last filed Form 10-Q, dated November 12, 2013, it had a mere $10,000 in revenue and $274,637 of research and development in the first nine months of 2013 and zero revenue and $418,594 of research and development the first nine months of 2012.

71.    Medistem was controlled by Neil Riordan, who was a majority shareholder, President, CEO, and Chairman of the Board. Mr. Riordan has a questionable history. He claims to have a Ph.D from the Medical University of the Americas in St. Kitts and Nevis. He controlled multiple offshore stem cell clinics, which are widely acknowledged to be scams. His clinic in Costa Rica was shuttered by the government in 2010 because there was zero proof that its treatments were effective. This clinic

was Medistem's first licensee. Medistem's Chief Scientific Officer, and later President and CEO, was Thomas Ichim, who claimed to have a Ph.D from the University of Science, Arts and Technology in Montserrat.

72. The value of Medistem's ERC technology is dubious. All three papers about ERC listed on Intrexon's website were co-authored by Riordan and Ichim. In a press release dated November 15, 2007, Medistem announced that it had co-discovered ERC and that the research was led by Dr. Xiaolong Meng of the Bio-Communications Research Institute. This institute, which no longer has a website, is located at the same Wichita, Kansas, address as one of Riordan's clinics. According to Spotlight's research, Dr. Xiaolong Meng is currently listed as an employee of the Bio-Communications Research Institute, the Riordan Clinic Research Institute, and a Chinese herb dispensary in Australia.

73. Although mAbLogix and ERC are not presented as Intrexon's most important technologies, they are featured on the Company's website and mentioned in some of its SEC filings. This demonstrates the lengths the Company goes to create this illusion of being a biotechnology powerhouse.

74. The Spotlight Report also discredited the remaining technologies listed on Intrexon's website: (i) the Neurospora and Agaricus platforms; (ii) Protein Engineering; (iii) Porcine Research Models; (iv) BeyondBio; and (v) ActoBiotics. *See* Exhibit B attached hereto.

### 4. High Scientist Turnover

75. Compounding the problem of having failed and/or low-value technologies, Intrexon had a practice of regularly laying off scientists to save on costs. CW3 stated that there was high turnover among scientists at Intrexon mainly due to frequent layoffs throughout CW3's tenure. CW2 also said that this was Intrexon's practice, noting that in the Industrial Products division, there were more former employees (35) than employees (25) during CW2's time there.

76. Both CW2 and CW3 agreed that Intrexon's practice of constant turnover made it difficult to complete projects. As CW2 stated, terminating the scientist who had developed the idea and expecting the project to be successful was not realistic. In addition, CW2 stated that this practice made

it difficult to establish ECCs with blue chip companies because the Company was laying off scientists who had developed project ideas and had good rapports with partner companies.

## B. The Failure of Intrexon's CAR-T Collaborations

77. During the Class Period, much of Intrexon's value and resources were tied up in collaborations to develop and commercialize CAR-T cancer therapies. CAR-T cells are genetically engineered T-cells with synthetic receptors that recognize a specific antigen expressed on tumor cells. When CAR-T cells bind to a target, an immunological attack against the cancer cells is triggered. Unfortunately, these CAR-T collaborations relied in large part on Intrexon's RheoSwitch technology, which was a failure.

78. In a press release issued on January 13, 2015, Intrexon announced that it and ECC oncology partner Ziopharm had entered into a broad exclusive licensing agreement with The University of Texas MD Anderson Cancer Center "for the development of non-viral adoptive cellular cancer immunotherapies." MD Anderson had "pioneered the design and clinical investigation of novel [CAR-T] therapies using non-viral gene integration platforms." The press release further stated, "Employing novel cell engineering techniques and multigenic gene programs, the collaboration will implement next-generation non-viral adoptive cellular therapies based on designer cytokines and CARs under control of RheoSwitch® technology targeting both hematologic and solid tumor malignancies."

79. Subsequently, in a press release issued on March 30, 2015, Intrexon announced that it had entered into "an exclusive strategic collaboration and license agreement" with Merck Serono, the biopharmaceutical business of Merck KGaA, "to develop and commercialize [CAR-T] cancer therapies." The press release further stated, "Utilizing Intrexon's cell engineering techniques and RheoSwitch® platform, the collaboration aims to develop leading-edge products that empower the immune system in a regulated manner to overcome the current challenges of CAR-T therapy."

80. Intrexon's main role in these CAR-T collaborations was to contribute a RheoSwitch technology that can effectively turn genes on or off, ensuring that a patient's immune system remains supercharged only for a limited time. Better control over gene expression allows one to fine-tune

selectivity and therefore improve the safety of the treatment. This feature was what differentiated Intrexon's CAR-T approach from other approaches that competitors were taking.

81.    The announcements of the CAR-T collaborations significantly drove up Intrexon's stock price. On January 13, 2016, Intrexon's stock price closed at $21.38. After the first CAR-T announcement, the stock price climbed steadily upward, reaching a closing price of $38.90 on March 7, 2016.

82.    As alleged above, however, RheoSwitch simply failed to operate as an effective, reliable gene switch. CW1, who worked on the CAR-T project in conjunction with the Immuno-Oncology group, stated that the application of RheoSwitch in the CAR-T project was not successful. As of the time CW1 left Intrexon, RheoSwitch was still not working properly. When the Spotlight Report revealed the history and provenance of the technology, investors were made aware that the CAR-T collaborations were doomed to fail.

83.    Indeed, in a press release issued after the Class Period on June 30, 2016, Intrexon announced that it and Ziopharm had amended their oncology ECCs. Under the revised ECCs, Intrexon received more upfront compensation in the form of $120 million of Ziopharm preferred shares and regular dividends. In exchange, Intrexon reduced its share of operating profits from any commercialized product from 50% to 20%. These amendments were widely interpreted as an acknowledgement that the CAR-T collaborations were much less valuable. But due to the Spotlight Report, investors already knew that.

## C.    Intrexon's Reliance on Microcap Companies and Round-Tripping Revenues

84.    Because of Intrexon's suite of undifferentiated and failed core technologies, the Company has not been successful in attracting substantial collaborations and partnerships with blue chip companies. Consequently, Intrexon had to partner with struggling, often failing, microcap companies with minimal revenues and negative free cash flows.

85.    Intrexon's biggest collaborations are with Ziopharm, Fibrocell Sciences, Inc., and Oragenics Inc. Historically, each of these companies consistently has had substantial net losses and negative cash flows from operating activities. Ziopharm's market capitalization is $792 million, Fibrocell's is $34 million, and Oragenics' is $29 million.

86. Intrexon does have collaborations with blue chip companies, including Merck & Co. Inc. (through Ares Trading S.A.); Eli Lilly & Co. (through Elanco Animal Health); Sanofi S.A.; Johnson & Johnson (through Janssen Pharmaceuticals, Inc.); and Sun Pharmaceuticals Industries Ltd. (through S&I Ophthalmic, LLC). But most of these blue chip collaborations are a negligible part of both Intrexon's and their partners' businesses.

87. In Intrexon's 2015 10-K, the Company reported collaboration revenue from just two blue chip partners. It received $4.7 million of collaboration revenue from Merck (Ares Trading) and $4.1 million from Sun Pharmaceutical (S&I Ophthalmic). Intrexon's 2015 Form 10-K does not even mention Eli Lilly (Elanco), Sanofi, or Johnson & Johnson (Janssen).

88. For 2015, Intrexon reported $87.8 million of collaboration and licensing revenue and $173.6 million of total revenue. Revenue from blue chip partners was $8.9 million, which represented only 10.1% of collaboration revenue and 5.1% of total revenue. The remainder came from collaborations or joint ventures with small cap or microcap companies. Revenue from Ziopharm, Fibrocell, and Oragenics alone was $38.0 million.

89. One important incentive that these struggling, small companies have to enter into ECCs with Intrexon is not only its hype machine, but also access to immediate cash, which Intrexon and cash-rich Kirk are able to provide. Given the low value of Intrexon's core technologies, the main value that these cash-starved companies are getting is upfront financing.

90. What investors are not told is that this upfront financing eventually makes its way back to Intrexon as revenue. This arrangement is essentially round-tripping revenue. First, Intrexon, and two other Krik-created companies, Third Security, or Harvest Capital Strategies, LLC (Intrexon entered into a collaboration with an investment fund sponsored by Harvest), gives cash to the collaborator through various investments. Second, the collaborator gives the cash back to Intrexon in the form of collaboration and licensing revenue – some of it immediately as technology access fees.

91. As the Spotlight Report pointed out, during the 2012-2015 period, Intrexon and Third Security provided $140.0 million of financing to its various ECC and joint venture partners, compared to $134.2 million recorded in collaboration revenue from those same partners. During the Class

Period, Intrexon disclosed the collaboration revenue it received from related parties. But the Company failed to disclose that its collaboration revenue was the result of round-tripping.

92. Moreover, Intrexon did not disclose that a material amount of its collaboration revenue came from Third Security – which was essentially Kirk bolstering Intrexon's revenue from his own very deep pockets.

93. Intrexon's collaboration with Fibrocell is a prime example. Pursuant to a purchase agreement, Third Security bought 8 million shares of Fibrocell stock in October 2012, which is also when the ECC between Intrexon and Fibrocell commenced. Third Security made subsequent investments in Fibrocell. These investments are set forth in the table below:

| Date | Entity | Transaction | No. of Shares | Price | Proceeds |
|------|--------|-------------|---------------|-------|----------|
| Oct. 2012 | Third Sec. | Primary offering | 8,000,000 | $2.50 | $20.0 MM |
| Oct. 2013 | Third Sec. | Primary offering | 2,439,024 | $4.10 | $10.0 MM |
| Oct. 2013 | Intrexon | Primary offering | 1,219,512 | $4.10 | $5.0 MM |
| July 2014 | Third Sec. | Primary offering | 582,116 | $5.80 | $3.4 MM |
| July 2014 | Third Sec. | Primary offering | 18,003 | $5.80 | $0.1 MM |
| July 2014 | Intrexon | Primary offering | 375,868 | $5.80 | $2.2 MM |

94. Third Security's cash injections supplemented those of Intrexon's. They were made at the same time as Intrexon's and were greater. These transactions were not disclosed in Intrexon's filings. In total, Third Security has provided approximately $33.5 million in financing to Fibrocell. From 2012 through 2015, Intrexon reported $23.3 million in collaboration revenue from Fibrocell.

95. Due to Intrexon's lack of transparency, the round-tripping of revenue could be even greater. The Company's business structure is highly complex and opaque. Much of its collaboration and licensing revenue are generated from Intrexon-created holding companies. The Intrexon-formed collaboration partners include: Intrexon Energy Partners, Intrexon Energy Partners II, Genopaver, Persea Bio, and Thrive Agrobiotics. Combined, their 2015 collaboration revenue was $18.9 million. The lack of transparency with respect to Intrexon-created holding companies, and any investments in

them made by Third Security and Harvest, helps conceal whether the revenue is coming from Intrexon-led financing making its way back to Intrexon.

**D.      Krishnan's Sudden Resignation**

96.     On March 21, 2016, just one month before the publication of the Spotlight Report would reveal Defendants' fraud, Intrexon issued a press release announcing that Krishnan and his wife, the Senior Vice President of Product Development, Suma Krishnan, were leaving the Company effective immediately. Their resignations were so abrupt that Intrexon had not found replacements; their responsibilities had to be assumed by a number of existing officers. Krishnan is not currently employed.

**VI.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

97.     During the Class Period, Defendants made numerous materially false and misleading statements and omissions in Intrexon's SEC filings. These actionable statements and omissions fall into three categories: (1) false and misleading statements and/or omissions concerning Intrexon's suite of proprietary technologies; (2) false and misleading statements and/or omissions concerning Intrexon's CAR-T collaborations and the RheoSwitch technology in particular; and (3) misleading revenue results.

**A.      Defendants' Material Misrepresentations and Omissions In Announcing Intrexon's 1Q 2015 Financial Results**

98.     On May 11, 2015 after the market's close, Intrexon issued a press release announcing its financial results for 1Q 2015,[2] which was also attached to a Form 8-K filed with the SEC and signed by Sterling. For the quarter, the Company reported total revenues of $33.8 million and collaboration revenues of $14.7 million.

99.     These financial results were materially false or misleading because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of round-trip transactions.

---

[2] References to Intrexon's fiscal years and quarters are referred to herein as "FY" and "1Q," "2Q," "3Q," or 4Q," respectively, and are followed by the corresponding year.

100. The press release prominently displayed the Company's business highlights and recent developments. The very first bullet point stated that Intrexon "[e]ntered into an exclusive collaboration and license agreement with the biopharmaceutical business of Merck KGaA, Darmstadt, Germany, to develop and commercialize chimeric antigen receptor T-cell (CAR-T) cancer therapies. *Utilizing Intrexon's* cell engineering techniques and *RheoSwitch® platform*, the collaboration aims to develop leading-edge products that empower the immune system in a regulated manner."

101. This statement above was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that RheoSwitch technology failed to work properly.

102. Also after the market's close on May 11, 2015, Intrexon filed a Quarterly Report on Form 10-Q, which was signed by Sterling and the accuracy certified by both Kirk and Sterling. In the Quarterly Report, the Company reported collaboration revenues of $14.7 million.

103. These financial results were materially false or misleading because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of round-trip transactions.

104. In the "Summary of Significant Accounting Policies" section, under the heading "Revenue Recognition," the 1Q Quarterly Report described Intrexon's revenue recognition policies in pertinent part as follows:

> The Company generates revenue through contractual agreements with collaborators (known as exclusive channel collaborations, "ECC" or "ECCs") . . . . Generally, the terms of these collaborative agreements provide that the Company receives some or all of the following: (i) upfront payments upon consummation of the agreement, (ii) reimbursements for costs incurred by the Company for research and development and/or manufacturing efforts related to specific applications provided for in the agreement, (iii) milestone payments upon the achievement of specified development, regulatory and commercial activities, and (iv) royalties on sales of products arising from the collaboration.

105. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that a material portion of collaboration revenues were the result of round-trip transactions.

106. The 1Q Quarterly Report also described Intrexon's business model in the "Overview" heading of the "Management's Discussion and Analysis of Financial Condition and Results of Operations," stating: "We believe we are a leader in the field of synthetic biology, an emerging and

rapidly evolving discipline that applies engineering principles to biological systems. Using our suite of proprietary and complementary technologies, we design, build and regulate gene programs, which are DNA sequences that consist of key genetic components."

107. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

108. On May 12, 2015 after the market's close, Intrexon attached to a Form 8-K, filed with the SEC, presentation slides. The slide numbered 9 stated:

## Integrated Technology Suite

**UltraVector®** is a modular, object-oriented DNA design & manufacturing platform enabling rapid construction of complex DNA

**RheoSwitch Therapeutic System®** provides inducible regulation of level and timing of gene expression

**AttSite® Recombinases** enable genome engineering and delivery technologies for targeted gene integration plus expression

**DNA/RNA Engineering** of genetic components to regulate transcription and modulate RNA persistence and translation

**Protein Engineering** utilizes bioinformatics to enhance stability, localization, and catalytic activity of proteins

**Cell Systems Informatics** guide selection of optimal pathways for genomic modification

**LEAP® Cell Processing** provides imaging and laser-based purification of high value cells

**ActoBiotics™** provide for *in situ* expression and secretion of novel biotherapeutic proteins and peptides through microbes

Intrexon has built, acquired and integrated a suite of technologies creating a one-stop-shop for start-to-finish conceptualization, engineering and production of bio-based solutions

9  © 2015 Intrexon Corp. All rights reserved.



109. The statement on the right of the slide, "Intrexon has built, acquired and integrated a suite of technologies creating a one-stop-shop for start-to-finish conceptualization, engineering and production of bio-based solutions" was materially false or misleading because it omitted the fact,

which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

110. The May 12, 2015 investor presentation slide also included the following slide, numbered 12:



## Controlling Gene Expression with RheoSwitch® Platform

RheoSwitch® gene regulation delivers precise control in multiple biological systems for a diverse range of applications including gene therapy, agriculture, and bio-therapeutics. Key attributes of RTS® platform:

- Transcriptional control of a broad range of therapeutic genes
- Modulates protein expression and allows for repeated inducibility
- Provides spatial and temporal control for genes of interest
- Dose-dependent gene expression demonstrated both *ex vivo* and *in vivo*
- Clinically validated with excellent safety profile
- Allows for independent regulation of multiple genes in a single cell

12   © 2015 Intrexon Corp. All rights reserved.



111. This slide was materially false or misleading because Defendants knew or recklessly ignored that RheoSwitch failed to work function properly.

112. The May 12, 2015 investor presentation slide also included the following slide, numbered 14:



14    © 2015 Intrexon Corp. All rights reserved.

113. This slide was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that development of the CAR-T therapies relied on RheoSwitch technology, which failed to work properly.

**B.      Defendants' Material Misrepresentations and Omissions In Announcing Intrexon's 2Q 2015 Financial Results**

114.  On August 10, 2015, Intrexon issued a press release announcing its financial results for 2Q 2015, which was also attached to a Form 8-K filed with the SEC and signed by Sterling. For the quarter, the Company reported total revenues of $44.9 million and collaboration and licensing revenues of $17.2 million. For the first half of the year, the Company reported total revenues of $78.7 million, collaboration and licensing revenues of $31.96 million.

115.  These financial results were materially false or misleading because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of round-trip transactions.

116. The press release also prominently displayed the Company's business highlights and recent developments. Among the highlights was that Intrexon

> Announced a Cooperative Research and Development Agreement with the National Cancer Institute (NCI). The principal goal is to develop and evaluate improved adoptive cell transfer-based immunotherapies (ACT) using NCI proprietary methods for the identification of autologous peripheral blood lymphocytes with naturally occurring endogenous anti-tumor activity combined with the RheoSwitch Therapeutic System® for introducing spatially and temporally controlled interleukin-12 (IL-12) expression in ACT/PBL/IL-12 for the treatment of patients with solid tumor malignancies[.]

117. The statement above was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that RheoSwitch technology failed to work properly.

118. On August 10, 2015, Intrexon filed a Quarterly Report on Form 10-Q, which was signed by Sterling and the accuracy certified by both Kirk and Sterling. In the Quarterly Report, the Company reported collaboration revenues of $17.2 million for the second quarter of 2015, and collaboration revenues of $31.96 million for the first half of 2015.

119. These financial results were materially false or misleading because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of round-trip transactions.

120. In the "Summary of Significant Accounting Policies" section, under the heading "Revenue Recognition," the 2Q Quarterly Report described Intrexon's revenue recognition policies in pertinent part as follows:

> The Company generates revenue through contractual agreements with collaborators (known as exclusive channel collaborations, "ECC" or "ECCs") . . . . Generally, the terms of these agreements provide that the Company receives some or all of the following: (i) upfront payments upon consummation of the agreement, (ii) reimbursements for costs incurred by the Company for research and development and/or manufacturing efforts related to specific applications provided for in the agreement, (iii) milestone payments upon the achievement of specified development, regulatory and commercial activities, and (iv) royalties on sales of products arising from the collaboration or licensing agreement.

121. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that a material portion of collaboration revenues were the result of round-trip transactions.

122. The 2Q Quarterly Report also described Intrexon's business model in the "Overview" heading of the "Management's Discussion and Analysis of Financial Condition and Results of Operations," stating: "We believe we are a leader in the field of synthetic biology, an emerging and rapidly evolving discipline that applies engineering principles to biological systems. Using our suite of proprietary and complementary technologies, we design, build and regulate gene programs, which are DNA sequences that consist of key genetic components."

123. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

**C.      Defendants' Material Misrepresentations and Omissions In Intrexon's August 2015 Public Offering Prospectus**

124. Intrexon filed a Preliminary Prospectus Supplement on August 20, 2015, and Prospectus Supplement on August 25, 2015 with the SEC both on Form 424B5 for a public offering of common stock, which supplemented a September 5, 2014 Automatic Shelf Registration Statement on Form S-3ASR (the "August Prospectus Supplement"). The Automatic Shelf Registration Statement was signed by Kirk and Sterling, among others. In this August 2015 offering, Intrexon sold over 5.6 million shares at a price of $41.00 per share, which resulted in gross proceeds of approximately $230 million.

125. The August Prospectus Supplement provided a summary overview of Intrexon, which was again repeated later in the Prospectus Supplement in another "Overview" section. Both of the overview sections stated: "We believe we are a leader in the field of synthetic biology, an emerging and rapidly evolving discipline that applies engineering principles to biological systems. Using our suite of proprietary and complementary technologies, we design, build and regulate gene programs, which are DNA sequences that consist of key genetic components."

126. These statements were materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

127. The summary in the August Prospectus Supplement also detailed the Company's intellectual property and stated that "[a] principal component of our strategy is maximizing the value of our ECCs through our intellectual property that covers our technologies[.]"

128. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

**D. Defendants' Material Misrepresentations and Omissions In Announcing Intrexon's 3Q 2015 Financial Results**

129. On November 9, 2015, Intrexon issued a press release announcing its financial results for 3Q 2015, which was also attached to a Form 8-K filed with the SEC and signed by Sterling. For the quarter, the Company reported total revenues of $53.4 million and collaboration and licensing revenues of $34.7 million." For the year-to-date (*i.e.*, through September 30, 2015), the Company reported total revenues of $132.1 million and collaboration and licensing revenues of $66.7 million.

130. These financial results were materially false or misleading because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of round-trip transactions.

131. On November 9, 2015, Intrexon filed a Quarterly Report on Form 10-Q, which was signed by Sterling and the accuracy certified by both Kirk and Sterling. In the Quarterly Report, the Company reported collaboration and licensing revenues of $34.7 million for the third quarter of 2015, and collaboration and licensing revenues of $66.7 million for the nine months ended September 30, 2015.

132. These financial results were materially false or misleading because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of round-trip transactions.

133. In the "Summary of Significant Accounting Policies" section, under the heading "Revenue Recognition," the 3Q Quarterly Report described Intrexon's revenue recognition policies in pertinent part as follows:

> The Company generates revenue through contractual agreements with collaborators (known as exclusive channel collaborations, "ECC" or "ECCs") and licensing

agreements whereby the collaborators or the licensee obtain exclusive access to the Company's proprietary technologies for use in the research, development and commercialization of products and/or treatments in a contractually specified field of use. Generally, the terms of these agreements provide that the Company receives some or all of the following: (i) upfront payments upon consummation of the agreement, (ii) reimbursements for costs incurred by the Company for research and development and/or manufacturing efforts related to specific applications provided for in the agreement, (iii) milestone payments upon the achievement of specified development, regulatory and commercial activities, and (iv) royalties on sales of products arising from the collaboration or licensing agreement.

134.  This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that a material portion of collaboration revenues were the result of round-trip transactions.

135.  The 3Q Quarterly Report also described Intrexon's business model in the "Overview" heading of the "Management's Discussion and Analysis of Financial Condition and Results of Operations," stating: "We believe we are a leader in the field of synthetic biology, an emerging and rapidly evolving discipline that applies engineering principles to biological systems. Using our suite of proprietary and complementary technologies, we design, build and regulate gene programs, which are DNA sequences that consist of key genetic components."

136.  This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

**E.    Defendants' Material Misrepresentations and Omissions In Intrexon's November 2015 Public Offering Prospectus**

137.  Intrexon filed a Prospectus Supplement on November 12, 2015 with the SEC on Form 424B5 for a public offering of common stock, which supplemented a September 5, 2014 Automatic Shelf Registration Statement on Form S-3ASR (the "November Prospectus Supplement"). The Automatic Shelf Registration Statement was signed by Kirk and Sterling, among others. The November Prospectus Supplement was filed following an agreement Intrexon entered into with Cantor Fitzgerald & Co. in which Intrexon may offer and sell its common stock having aggregate sales proceeds of up to $200,000,000 from time to time through Cantor.

138.  The November Prospectus Supplement provided a summary overview of Intrexon, which was again repeated later in the November Prospectus Supplement in another "Overview" section. Both

of the overview sections stated: "We believe we are a leader in the field of synthetic biology, an emerging and rapidly evolving discipline that applies engineering principles to biological systems. Using our suite of proprietary and complementary technologies, we design, build and regulate gene programs, which are DNA sequences that consist of key genetic components."

139. These statements were materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

140. The summary in the November Prospectus Supplement also detailed the Company's intellectual property and stated that "[a] principal component of our strategy is maximizing the value of our ECCs through our intellectual property that covers our technologies[.]"

141. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

**F.    Defendants' Material Misrepresentations and Omissions In Intrexon's December 2015 Public Offering Prospectus**

142. Intrexon filed a Prospectus Supplement on December 3, 2015 with the SEC on Form 424B7 for a public offering of common stock, which supplemented a September 5, 2014 Automatic Shelf Registration Statement on Form S-3ASR (the "December Prospectus Supplement"). The Automatic Shelf Registration Statement was signed by Kirk and Sterling, among others. The December Prospectus Supplement was filed to cover the resale of shares of Intrexon common stock issued and to be issued in connection with Intrexon's earlier acquisition of Oxitec Limited.

143. The December Prospectus Supplement provided a summary overview of Intrexon, which was again repeated later in the December Prospectus Supplement in another "Overview" section. Both of the overview sections stated: "We believe we are a leader in the field of synthetic biology, an emerging and rapidly evolving discipline that applies engineering principles to biological systems. Using our suite of proprietary and complementary technologies, we design, build and regulate gene programs, which are DNA sequences that consist of key genetic components."

144. These statements were materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

145. The summary in the December Prospectus Supplement also detailed the Company's intellectual property and stated that "[a] principal component of our strategy is maximizing the value of our ECCs through our intellectual property that covers our technologies[.]"

146. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

**G. Defendants' Material Misrepresentations and Omissions In Announcing Intrexon's 4Q 2015 and FY 2015 Financial Results**

147. On February 29, 2016, Intrexon issued a press release announcing its financial results for 4Q 2015 and FY 2015, which was also attached to a Form 8-K filed with the SEC and signed by Sterling. For the quarter, the Company reported total revenues of $41.5 million and collaboration and licensing revenues of $21.1 million compared to the fourth quarter of 2014. For the year, the Company reported total revenues of $173.6 million and collaboration and licensing revenues of $87.8 million.

148. These financial results were materially false or misleading because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of round-trip transactions.

149. Also on November 9, 2015, Intrexon filed an Annual Report on Form 10-K, and both Kirk and Sterling signed and certified the accuracy of the Annual Report. In the Annual Report, the Company reported collaboration and licensing revenues of $87.8 million for the 2015 year.

150. These financial results were materially false or misleading because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of round-trip transactions.

151. In the "Critical Accounting Policies and Estimates" section, under the heading "Revenue Recognition," the Annual Report described Intrexon's revenue recognition policies in pertinent part as follows:

We generate revenue through contractual agreements with collaborators and licensing agreements whereby the collaborators or the licensees obtain exclusive access to our proprietary technologies for use in the research, development and commercialization of products and/or treatments in a contractually specified field of use. Generally, the terms of these agreements provide that we receive some or all of the following: (i) upfront payments upon consummation of the agreement; (ii) reimbursements for costs incurred by us for research and development and/or manufacturing efforts related to specific applications provided for in the agreement; (iii) milestone payments upon the achievement of specified development, regulatory and commercial activities; and (iv) royalties on sales of products arising from the collaboration or licensing agreement.

152. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that a material portion of collaboration revenues were the result of round-trip transactions.

153. In Item 1 to the Annual Report Defendants described Intrexon's business, stating in pertinent part:

We believe we are a leader in the field of synthetic biology, an emerging and rapidly evolving discipline that applies engineering principles to biological systems to enable rational, design-based control of cellular function for a specific purpose.

* * *

Our business model is to commercialize our technologies through exclusive channel collaborations, or ECCs, with collaborators that have industry expertise, development resources and sales and marketing capabilities to bring new and improved products and processes to market.

* * *

Our business model entails the formation of ECCs with collaborators that have expertise within specific industry sectors. In our ECCs, we provide expertise in the engineering, fabrication and modification of gene programs and cellular systems, and our collaborators are responsible for providing commercial market and product development expertise, as well as sales and marketing capabilities.

154. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

155. In explaining what synthetic biology is, the Annual Report detailed Intrexon's "approach," and further detailed that:

To support our approach, we have developed, acquired, and integrated a unique suite of technologies, and we continue to expand upon their capabilities. These technologies include: our UltraVector gene design and fabrication platform, and its associated library of modular DNA components; Cell Systems Informatics; RheoSwitch inducible gene switch; AttSite Recombinases; Protein Engineering; Laser-Enabled Analysis and Processing, or LEAP; and ActoBiotics platform.

156. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

157. The Annual Statement then set forth a list of Intrexon's competitive strengths, including that the Company "built a suite of proprietary and complementary technologies that provides us with a comprehensive ability to design, create, modify and regulate gene programs and cellular systems . . . . By virtue of the complementary nature of our technologies, we are able to provide our collaborators with a diverse array of capabilities, representing a 'one stop shop[.]'"

158. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

159. The Annual Statement also listed as competitive strength the following:

> **We believe we are a leader in synthetic biology**
>
> We believe we are the first company focused exclusively on applying synthetic biology across a broad spectrum of end markets . . . . Over the last 18 years, we have accumulated extensive knowledge and experience in the design, modification and regulation of gene programs. We believe all of these factors, coupled with our suite of proprietary and complementary technologies, provide us with a first-mover advantage in synthetic biology.

(emphasis in original).

160. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that Intrexon's proprietary suite of technologies consisted of undifferentiated, commodity, and/or failed technologies.

161. In addition, the Annual Statement contained detailed numerous risks unique to Intrexon. The discussion included the following:

> We intend to employ technologies licensed from MD Anderson . . . , together with our existing suite of proprietary technologies, through both our existing exclusive collaboration agreement with ZIOPHARM and our existing collaboration with Ares Trading S.A., . . . to pursue the development and commercialization of adoptive cellular therapies based on CARs **under control of RheoSwitch technology** targeting a variety of cancer malignancies.

(emphasis supplied).

162. This statement was materially false or misleading because it omitted the fact, which Defendants knew or recklessly ignored, that RheoSwitch technology failed to work properly.

## H. Defendants' Other Material Misrepresentations and Omissions Concerning its RheoSwitch Technology

163. On a May 11, 2015 earnings call to discuss the 1Q 2015 financial results in which Kirk and Krishnan participated, in the prepared opening remarks Krishnan discussed the ECC and licensing agreement with Merck KGaA to develop and commercialize CAR-T therapies, and explained that the collaboration was "[u]tilizing Intrexon's RheoSwitch platform and proprietary suite of technologies to engineer T-cells."

164. Also in the opening remarks for the May 11, 2015 earnings call, Krishnan described another collaboration with the National Cancer Institute "entered to develop RheoSwitch-controlled, IL-12 cancer therapy for the treatment of patients with solid tumor malignancies."

165. On June 6, 2015, Intrexon issued a press release and information statement announcing a special dividend to its shareholders of Ziopharm common stock, which were also attached to a Form 8-K filed with the SEC. The information statement included information about Ziopharm. The overview of the company included the following:

> In addition to ZIOPHARM synthetic biology programs, Intrexon (and ZIOPHARM, through its ECC agreement with Intrexon) recently obtained an exclusive, worldwide license to certain immuno-oncology technologies owned and licensed by The University of Texas M.D. Anderson Cancer Center, or MD Anderson, including technologies relating to novel chimeric antigen receptors, or CARs, natural killer, or NK cells and T cell receptors, or TCRs. Combining these technologies with Intrexon's technology suite and clinically tested RheoSwitch Therapeutic System® . . . ZIOPHARM plans to develop CAR-T and other immune cells that will target and kill cancer cells.

166. On the August 10, 2015, earnings call to discuss the 2Q 2015 financial results, in which Kirk and Krishnan participated, in the prepared opening remarks Krishnan discussed progress in one of the collaborations with Ziopharm, stating:

> ZIOPHARM has begun to recruit patients in clinical trials against brain cancer and breast cancer using the RheoSwitch controlled IL-12. *The ability to tune and regulate the expression of this powerful cytokine and a broad array of other genes via our RheoSwitch technology opens the door to safer approaches within the growing field of gene therapy.*

(emphasis supplied).

167. Later in the opening remarks to the August 10, 2015 earnings call, Krishnan detailed Intrexon's relationship with Ziopharm and the collaborations between the two companies:

> We have programs in adoptive cell therapies, including T cells and TCR's. We have NK programs. We have viral and nonviral gene integration. We have autologous and allogeneic approaches. But among the most fundamental is we have a range of approaches, ***starting with the RheoSwitch that deals with the controlled gene therapy controlled expression. And I think that will be the foundation stone for making advances in this field.***

(emphasis supplied).

168. On September 28, 2015, Intrexon issued a press release announcing a new ECC with Ziopharm for the treatment and prevention of graft-versus-host disease ("GvHD"), which was also attached to a Form 8-K filed with the SEC. The press release further explained that "the companies plan to pursue engineered cell therapy strategies, used either separately or in combination, for targeted treatment of GvHD. The first approach is infusion of regulatory T cells (Tregs) conditionally expressing IL-2 utilizing Intrexon's proprietary gene control approaches such as its RheoSwitch® platform."

169. The above statements were materially false or misleading because they omitted the fact, which Defendants knew or recklessly ignored, that RheoSwitch technology failed to work properly.

## VII. LOSS CAUSATION

170. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

171. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and other Class members. During the Class Period, Plaintiff and other Class members purchased or acquired Intrexon securities at artificially inflated prices in reliance on Defendants' material misrepresentations and omissions. The price of those securities declined significantly when information disclosed to the market for the first time corrected those material misrepresentations and omissions.

172. Prior to April 21, 2016, Defendants had misled investors regarding the true nature of Intrexon's business, revenue, and core technologies. On April 21, 2016, investors learned the truth when analyst firm Spotlight Research released the first part of its 8-part report about Intrexon in a post

on the Seeking Alpha website, describing the Company as the "Theranos of the public markets" and stating "Intrexon has been around for more than 17 years and commercialized effectively zero meaningful commercial products using its own technology."

173. At the beginning of the Report released on April 21, 2016, Spotlight Research provided an executive summary summarizing each part of its eight-part report. In this summary, Spotlight explained that the Company's partners are mostly "failed/failing and/or shady microcaps that have no other options" and that:

> XON employs lots of fancy jargon to explain their core technologies. We examined each closely and we found nothing more than a collection of products that anyone can (and does) use themselves smashed together with failed science experiments from years ago. One of XON's key technologies was literally <u>given away</u> by its previous owner.

(emphasis in original).

174. The executive summary also stated that:

> XON, together with CEO RJ Kirk's private investment firm Third Security, have created an intricate web of microcap, zero revenue, free cash flow negative companies that seem to exist solely for the purpose of inflating XON's revenue and profitability. XON and Third Security inject cash into these shell companies who, in exchange, "buy" services from XON with that cash. The cash in from XON/Third Security rarely exceeds the cash that comes back meaning that XON is effectively financing cash flows back into revenue and profits through round-tripping their own cash.

175. In reaction to this news, the market drove down the value of Intrexon's shares. Its stock declined approximately 26% to a closing price of $27.10, a drop of $9.73 per share on April 21, 2016, on usually heavy trading volume.

176. Then on April 27, 2016, prior to the market's open, Spotlight Research released parts two through eight of their report. In this second release, Spotlight Research examined Intrexon's round-tripping of cash and technologies in detail, disclosing that Intrexon's core technologies were actually commodity technologies.

177. On this news, shares of Intrexon dropped pre-market in response, and TheStreet.com noted that Intrexon's "stock is lower in late-morning trading on Wednesday after Spotlight Research released the final portion of its report on the company." On this day, April 27, 2016, Intrexon's stock fell to a low of $23.35 per share, dropping $3.57 or over 13% on unusually heavy trading volume, before closing at a higher stock price.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

178. The market for Intrexon's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Intrexon's securities traded at artificially inflated prices during the Class Period. On August 5, 2015, the Company's stock closed at a Class Period high of $68.71 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Intrexon's securities and market information relating to Intrexon, and have been damaged thereby.

179. During the Class Period, the artificial inflation of Intrexon's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Intrexon's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Intrexon and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

180. At all relevant times, the market for Intrexon's securities was an efficient market for the following reasons, among others:

      a. Intrexon stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      b. As a regulated issuer, Intrexon filed periodic public reports with the SEC and/or the NYSE;

      c. Intrexon regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national

circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

        d.     Intrexon was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or

        e.     The average daily trading volume for Intrexon securities during the Class Period was approximately 1.932 million shares, with almost 116.8 million shares of stock outstanding as of February 15, 2016, and a market capitalization reaching approximately $7.5 billion during the Class Period.

181. As a result of the foregoing, the market for Intrexon's securities promptly digested current information regarding Intrexon from all publicly available sources and reflected such information in Intrexon's stock price. Under these circumstances, all purchasers of Intrexon's securities during the Class Period suffered similar injury through their purchase of Intrexon's securities at artificially inflated prices and a presumption of reliance applies.

182. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

183. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

184. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

185. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Intrexon who knew that the statement was false when made.

## X. CLASS ACTION ALLEGATIONS

186. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Intrexon's securities between May 11, 2015 and April 27, 2016, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

187. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Intrexon's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Intrexon shares were traded publicly during the Class Period on the

NYSE. As of February 15, 2016, Intrexon had 116,779,394 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Intrexon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

188.  Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

189.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

190.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

   b.   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Intrexon;

   c.   whether Defendants knew or deliberately disregarded that their statements were false and misleading;

   d.   whether the price of Intrexon securities were artificially inflated because of Defendants' conduct complained of herein; and

   e.   to what extent the members of the Class have sustained damages and the proper measure of damages.

191.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

# XI.   CLAIMS FOR RELIEF

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against Defendant Intrexon and the Individual Defendants**

192.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

193.  During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Intrexon's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

194.  Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Intrexon's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

195.  Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Intrexon's financial well-being and prospects, as specified herein.

196.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Intrexon's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make

the statements made about Intrexon and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

197. Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

198. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Intrexon's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

199. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Intrexon's securities

was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Intrexon's securities during the Class Period at artificially high prices and were damaged thereby.

200. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Intrexon was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Intrexon securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

201. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

202. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

203. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

204. The Individual Defendants acted as controlling persons of Intrexon within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control

and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

205. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

206. As set forth above, Intrexon and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)      declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)      awarding compensatory damages in favor of Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d)      awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: September 22, 2016

Respectfully submitted,

GLANCY PRONGAY & MURRAY LLP

By: _s/ Joshua L. Crowell_
Lionel Z. Glancy
Robert V. Prongay
Joshua L. Crowell
Leanne H. Solish
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com
rprongay@glancylaw.com
jcrowell@glancylaw.com
lsolish@glancylaw.com

*Attorneys for Lead Plaintiff Joe Seppen and Lead*
*Counsel for the Class*

Adam A. Apton
LEVI & KORSINSKY LLP
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
Email: aapton@zlk.com

*Additional Counsel for Plaintiff*

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On September 22, 2016, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 22nd day of September, 2016, at Los Angeles, California.

*s/ Joshua L. Crowell*
Joshua L. Crowell

# Mailing Information for a Case 3:16-cv-02398-RS In re Intrexon Corporation Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jerome F. Birn , Jr**
  jbirn@wsgr.com

- **Joshua L Crowell**
  jcrowell@glancylaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Nina F. Locker**
  nlocker@wsgr.com,lkoontz@wsgr.com,calendar@wsgr.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Nicholas R Miller**
  nmiller@wsgr.com,vhernandez@wsgr.com

- **Joni L. Ostler**
  jostler@wsgr.com,pbaird@wsgr.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)