UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INTREXON CORPORATION SECURITIES LITIGATION | Case No. 16-cv-02398-RS <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |

# I. INTRODUCTION

Lead plaintiff Joe Seppen brings this putative class action for securities fraud against defendants Intrexon Corp., Randal J. Kirk, Rick L. Sterling, and Krish S. Krishan (collectively "Defendants"). Intrexon is a biotechnology company that focuses on developing tools for designing, building, and regulating genes. In April 2016, an anonymous short-seller named Spotlight Research published a report concluding that Intrexon's core technology suite was overhyped and its revenue was heavily driven by "round-tripping." Almost exclusively on this basis, Plaintiff alleges violations of the Securities Exchange Act of 1934. Defendants move to dismiss the amended complaint on the grounds that Plaintiff fails to state a claim. For the reasons stated below, Defendants' motion to dismiss is granted with leave to amend.

# II. BACKGROUND[1]

Intrexon builds and acquires technologies that design, modify and regulate DNA sequences. Intrexon's technologies include UltraVector (a DNA design and fabrication platform),

---

[1] This factual background is based on the averments in the amended complaint, which must be accepted as true at this stage, as well as public records properly subject to judicial notice.

RheoSwitch (a gene switch for regulation of level and timing of gene expression), AttSite Recombinases (a tool for enabling targeted gene delivery), Cell Systems Informatics (a guide for selection of pathways for genomic modification), Laser-Enabled Analysis and Processing ("LEAP") (a platform for imaging and laser-based purification of high-value cells), and others.

Intrexon's business model is designed around collaborations with other companies. These collaborations include exclusive channel collaborations, research collaborations, and joint ventures. Intrexon licenses its tools to collaborators who provide product development expertise in their specific industry sectors. Intrexon earns revenue from its partners through license fees, reimbursement for research and development costs, milestone payments and future royalties.

In April 2016, an anonymous short-seller known as "Spotlight Research" released an eight-part report about Intrexon. The report concluded that Intrexon's core technology suite consists of an "overhyped, undifferentiated collection of commodity and failed products." ACAC, Ex. B at 39. For example, it said UltraVector is a "common DNA synthesizer" and that "Rheoswitch gained no traction over the years." *Id*. at 76, 80. It also opined that Intrexon's revenues were overstated. It claimed that Intrexon "created an intricate web of microcap, zero revenue, free cash flow negative companies that seem to exist solely for the purpose of inflating Intrexon's revenue and profitability." *Id*. at 1.

This lawsuit was filed shortly after the Spotlight report's publication. Plaintiff brings suit against Intrexon, Kirk, Sterling, and Krishnan. Kirk has been Intrexon's Chief Executive Officer since 2009 and his investment management firm, Third Security LLC, has often invested alongside Intrexon and other partners involved in various collaborations. Sterling has been Intrexon's Chief Financial Officer since 2007. Krishan was Intrexon's Chief Operation Officer from 2011 until his resignation in March 2016. The Amended Class Action Complaint ("ACAC") primarily recites the findings of the Spotlight report. It also includes brief statements from three confidential witnesses. In his first claim, Plaintiff avers that Defendants violated section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. In his second claim, he asserts a violation of section 20(a) of the Exchange Act. Plaintiff is suing on behalf of all persons

who purchased Intrexon securities between May 11, 2015 and April 27, 2016.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 US 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Claims grounded in fraud are also subject to Rule 9(b), which provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy that rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 US at 570). "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 US at 555 ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true)). In actions governed by the Private Securities Litigation Reform Act ("PSLRA"), such as this one, these general standards are subject to further refinement, as discussed in more detail below.

### IV. DISCUSSION

A. Count I—Section 10(b) of the Exchange Act

Section 10(b) makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 further provides: "It shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c). A claim for violation of Rule 10b-5 includes five elements: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Id.* (quoting *In re Daou Sys., Inc. Secs. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005)) (internal quotation marks omitted). Defendants move to dismiss the section 10(b) claim for failure to plead the elements of a material misrepresentation or omission, scienter, and loss causation.

1. Material Misrepresentation or Omission (Falsity)

Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. 78u-4(b)(1). Plaintiff alleges three categories of purportedly "false" statements: (1) statements concerning Intrexon's suite of technologies; (2) statements concerning Intrexon's CAR-T collaborations; and (3) revenue disclosures. Specifically, Plaintiff alleges that statements related to Intrexon's technology suite are misleading because the suite consisted of undifferentiated, commodity, and/or failed technologies. He alleges that statements related to Intrexon's CAR-T collaborations using the RheoSwitch technology are misleading because RheoSwitch failed to function properly. Finally, he claims Intrexon's revenue disclosures are misleading because a material portion of revenues ascribable to collaborations are the result of "round-trip" transactions. Plaintiff's efforts to allege a material misrepresentation or omission fail for several reasons.

First, with respect to the statements regarding Intrexon's suite of products, Plaintiff's allegations lack specificity. He argues repeatedly that Intrexon's "core technology suite" is worthless but nowhere defines the scope of that "suite." The challenged statements make no mention of a "core technology suite," so the term appears to be one of Plaintiff's (or Spotlight's) own making. The ACAC includes one slide from an investor presentation that is entitled "Integrated Technology Suite," which lists several technologies, but it does not allege facts related to each technology listed therein and does include factual allegations related to unidentified technologies, rendering that list both over and under inclusive and unenlightening on the scope of the term "core technology suite." *See* ACAC ¶¶ 108, 65-74. Moreover, the challenged statements do not appear limited to any specific subset of Intrexon's technologies. To the contrary, they refer broadly to Intrexon's "proprietary and complementary technologies" and those Intrexon has "built, acquired and integrated."

Second, most of the challenged statements concerning CAR-T collaborations relate to future expectations. *See, e.g.*, ACAC ¶¶ 100 ("aims to develop"); 116 ("goal is to develop"); 161 ("intend to employ"); 165 ("plans to develop"); 168 ("plan to pursue"). The PSLRA Safe Harbor protects projections of future performance and "the assumptions underlying or relating to" such projections if they are identified and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(i)(1)(D); 15 U.S.C. § 78u-5(c)(1). Here, Intrexon identified such statements as forward-looking and accompanied them with cautionary statements and/or a discussion of "risk factors." *See, e.g.*, RJN Exs. 1 at 4-5, 19-39; 18 at 4-5; 19 at 1; 20 at 4; 21 at 1-3; 22 at 3; 23 at 4.[2] Plaintiff contends that these statements are of a mixed present/future quality that are not entitled to the safe harbor. Yet, "examined as a whole . . . [they] relate[] to

---

[2] Intrexon requests judicial notice of several SEC filings. Judicial notice of such public records is proper, so the request is granted. *See Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).

future expectations and performance." *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014). As such, they are protected by the PSLRA's Safe Harbor.

Third, a substantial portion of the statements quoted in the ACAC are best characterized as "puffery" or other non-specific assertions that cannot give rise to a fraud claim. For example, Plaintiff takes issue with statements like: "We believe we are a leader in the field of synthetic biology," ACAC ¶¶ 106, 122, 125, 135, 138, 143, 153, "Intrexon has built, acquired and integrated a suite of technologies creating a one-stop-shop for start-to-finish conceptualization, engineering and production of bio-based solutions," *id.* ¶ 109, and "We have accumulated extensive knowledge and experience . . . [and] believe all of these factors, coupled with our suite of proprietary and complementary technologies, provides us with a first-mover advantage in synthetic biology." *Id.* ¶ 159. These vague, general statements of optimism are non-actionable puffery. *See In re Cutera Securities Litigation*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation."). Even viewed in context, these challenged statements fail to rise to more than general characterizations and opinions.

Finally, even if otherwise actionable, Plaintiff has not sufficiently alleged the falsity of the statements in any of the three categories:

a. <u>Suite of Technologies</u>

Plaintiff challenges statements related to Intrexon's technology suite, such as: "Using our suite of proprietary and complementary technologies, we design, build, and regulate gene programs." ACAC ¶¶ 106, 122, 125, 135, 138, 143. The challenged statements refer to Intrexon's "suite of proprietary and complementary technologies" or the suite of technologies Intrexon has "built, acquired, and integrated." On their face, these statements relate to Intrexon's entire suite of technologies and make no specific representations about the provenance or value of any specific technology. Accordingly, even if Plaintiff's allegations sufficed to establish that one or two of Intrexon's technologies were undifferentiated, or amounted to commodities with in some instances

track records of failure, that alone would not establish the falsity of the statements regarding Intrexon's suite of technologies. Plaintiff argues that this is an "overly literal" approach. He claims that the challenged statements give a misleading impression about the value of each of the technologies in the suite. Intrexon, however, specifically told investors: "There are companies that have competing technologies for individual pieces of our suite of complementary technologies. For example, there are companies that can synthesize DNA." RJN, Ex. 1 at 14. At minimum, Plaintiff's argument that Intrexon misled consumers into believing that UltraVector, its DNA synthesis product, had unique value is unavailing given Intrexon's express disclaimer that other companies synthesize DNA. Even for the remaining technologies, Plaintiff's interpretation is unpersuasive.

In any event, Plaintiff fails to allege facts sufficient to establish that the remaining technologies identified in the complaint were worthless or nothing more than commodities. As explained below, Plaintiff fails to advance sufficient facts to show that RheoSwitch failed. As for the other technologies, Plaintiff relies almost exclusively on the Spotlight report, which primarily attacks the companies that previously owned or researched those technologies. For example, for Cell Systems Informatics, acquired by Intrexon in 2011, Spotlight reports that the former owner licensed the core technology from a company with low licensing revenues. Likewise, for the LEAP platform, acquired by Intrexon in 2011, Spotlight reports that a 2006 study paid for by the former owner projected low total revenue and net selling prices in 2006. Plaintiff's allegations regarding the other technologies, such as Endometrial Regenerative Cells and mABLogix, nowhere found in any of the challenged statements, are similar.[3] Plaintiff alleges no facts related to the function or value of these technologies, particularly in current times.

Instead, Plaintiff argues that "the proof is in the market outcomes." He claims the market reaction to the Spotlight report proves Intrexon's technologies were "overhyped." As Defendants

---

[3] Plaintiff alleges that confidential witness number 1 (CW1) stated that "mAbLogic never worked," but advances no facts to suggest CW1's personal knowledge of the technology or the reliability of her opinion. ACAC ¶ 68.

note, this is essentially a fraud-by-hindsight argument. A plaintiff cannot show that a prior statement was false or misleading merely by pointing to the market reaction upon a subsequent disclosure of information. *See, e.g., In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002) *abrogated on other grounds, S. Ferry LP v. Killinger*, 542 F.3d 776 (9th Cir. 2008). "[E]vidence of stock price movements provides no rational basis for determining whether [a product's] risks were adequately conveyed to the public." *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989); *see also Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett Packard Co.*, No. 14-16433, 2017 U.S. App. LEXIS 955, at *20-21 (9th Cir. Jan. 19, 2017) (rejecting argument that stock price drop indicates material misrepresentation). Plaintiff also claims that the "marginal value" of Intrexon's technology suite is evidenced by the company's failure to attract collaborations with blue-chip companies. He acknowledges, however, that Intrexon collaborates with companies like Merck and Sanofi and research centers like the M.D. Anderson Cancer Center at the University of Texas and the National Cancer Institute. His only response is that those collaborations make up a small percentage of Intrexon's overall revenue. The allegation that those collaborations drive only a small portion of Intrexon's revenue does not support the falsity of generic statements related to the value and provenance of Intrexon's amorphous "suite" of technologies.

b. CAR-T Collaborations & RheoSwitch

Plaintiff alleges that RheoSwitch failed to function properly and thus challenges statements related to the RheoSwitch platform, like "RheoSwitch gene regulation delivers precise control in multiple biological systems" or "utilizing Intrexon's . . . RheoSwitch platform, the collaboration aims to develop leading-edge products." ACAC ¶¶ 100, 110. In support of the claim that RheoSwitch failed to function properly, Plaintiff relies primarily on the statement of CW1. That individual stated that RheoSwitch was supposed to work like a light switch subject to being turned on and off, but in reality worked more like a dimmer switch; "it turned the gene on, but it was difficult to turn the gene completely off." ACAC ¶ 53. This vague statement falls short. CW1 does not state, as Plaintiff contends, that RheoSwitch failed to work properly in multiple

ORDER RE: MOTION TO DISMISS
CASE NO. 16-cv-02398-RS

biological systems. Rather, she says that, in her experience, it did not work "as it should." CW1 was an Associate Director in the Health Sector group from 2011-2016; she worked on one CAR-T project in one division. That the technology might have been unsuccessful in one single application does not suggest its uselessness for other applications. CW1 does not opine on RheoSwitch's functionality in any other context, including any other CAR-T collaborations. She made no statements about RheoSwitch's use by collaborators, nor did she deny that collaborators developed cancer therapies using RheoSwitch. In fact, Plaintiff acknowledges that RheoSwitch was used in several collaborations, including ones involving cancer therapies that are in Phase I and II clinical trials. *See* ACAC ¶ 53; *id.,* Ex. B at 37-38.

Aside from the opinion of CW1, Plaintiff relies on Spotlight's attack on the company that formerly owned the RheoSwitch technology, RheoGene. Plaintiff alleges that RheoGene donated the RheoSwitch technology to the University of Pittsburgh Medical Center ("UPMC") for a tax write-off in 2003. Defendants contend the primary sources relied upon by Spotlight reveal that RheoGene's transaction with UPMC was actually a strategic partnership in which UPMC agreed to own and fund RheoGene and continue to develop its technology. Plaintiffs' allegation relates to a decade-old event and is insufficient to show that RheoSwitch, in its current form, constitutes a failed technology. At most, the facts alleged might raise a question about the value of the technology in 2003, but not its functionality. For these reasons, Plaintiff fails to allege facts sufficient to suggest the falsity of Intrexon's statements regarding its CAR-T collaborations involving RheoSwitch.

#### c. Round-Tripping

While conceding that Intrexon complied with applicable accounting and SEC disclosure rules, Plaintiff alleges Intrexon nonetheless reported misleading revenue figures. In particular, he alleges the revenue reports were deceptive because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of "round-trip" transactions. Plaintiff, however, does not allege the usual "round-tripping" exchange of like services. A typical "round-tripping" scheme "involves parties entering into reciprocal contracts to exchange similar amounts

of money for similar services." *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 178 (4th Cir. 2007)(citing *In re Homestore.com, Inc. Sec. Litig.*, 252 F.Supp.2d 1018, 1024–25 (C.D. Cal. 2003)). "Such transactions can be improper because the parties book revenues even though the transactions 'wash out' without any economic substance. But the basis for alleging 'round-tripping' does not exist when either of the transactions have economic substance because those transactions would not wash out." *Id.* Here, Plaintiff does not allege that Intrexon's collaboration agreements involved reciprocal contracts to exchange similar amounts of money or that the agreement lacked economic substance.

Principally, Plaintiff alleges that Intrexon's revenue figures were materially misleading because the company failed to disclose that a substantial portion of its revenue was ultimately sourced by Intrexon or Kirk, its CEO. Yet, as noted above, Intrexon disclosed its revenue recognition policy and relationships with collaborators in detail as required by GAAP and SEC regulations. Intrexon specifically disclosed that it has engaged in a variety of transactions with companies in which Kirk and his affiliates have an interest. *See* RJN, Ex. 29. That Intrexon did not disclose the specific source of each revenue dollar in order to dispel Plaintiff's theory of liability does not render its lawful and accurate revenue disclosures deceptive. *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 (9th Cir. 2012) (no requirement to disclose every relevant fact, "even if investors would consider the omitted information significant," as long as "the omissions do not make the actual statements misleading").

2. Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In particular, the complaint must allege the defendant "made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Systems, Inc.,* 411 F.3d 1006, 1015 (9th Cir. 2005) (citing *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 974 (9th Cir. 1999)). "Reckless conduct

may be defined as a highly unreasonable omission, involving ... an extreme departure from the standards of ordinary care ... that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 702 (9th Cir. 2012) (quoting *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir. 1990)).

Here, the absence of an adequate pleading of material misstatements or omissions necessarily means Plaintiff has failed to plead scienter as well. In essence, Plaintiff is alleging that Defendants overhyped their core technologies, collaborations, and revenue, so that they could acquire other valuable technologies. While Plaintiff is trying to argue that Intrexon management was aware of the worthlessness of Intrexon's technologies and collaborations at the time they were making the generally positive public statements, an equally plausible inference is that Intrexon management believed the collaborations and technology suite had value. Moreover, the ACAC does not include any allegations related to the individual defendants' trading histories. Plaintiff alleges no facts to suggest that the individual defendants' trading practices during the class period were "dramatically out of line" with prior trading practices. *Zucco Partners*, 552 F.3d at 1005.[4]

Plaintiff seeks to invoke the "core operations" doctrine by arguing that Defendants must have known the minimal value of Intrexon's technology suite given their roles at the company. Allegations regarding management's role in a company may conceivably satisfy the PSLRA standard, "without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). Plaintiff has failed to advance facts suggesting that this is such a case.

---

[4] Plaintiff argues that the individual defendants' trading histories are irrelevant here because he has not pleaded motive. Yet, in the complaint and the opposition brief, he argues that Defendants had a financial motive for overhyping the technologies. In any event, even if motive is not required to plead scienter, the fact of stock sales (or lack thereof) during the class period is a consideration in the scienter analysis. *See, e.g., In re Rigel Pharms.*, 697 F.3d at 884 ("because none of the defendants sold stock during the period between the allegedly fraudulent statements and the subsequent public disclosure . . . the value of the stock and stock options does not support an inference of scienter"); *In re Apple Computer Sec. Litig.*, 886 F.2d at 1117 ("Apple's massive investment [] demonstrates this good faith.").

ORDER RE: MOTION TO DISMISS
CASE NO. 16-cv-02398-RS
11

"Where defendants make cheerful predictions that do not come to pass, plaintiffs may not argue, based only on defendants' prominent positions in the company, that they ought to have known better. Instead, the PSLRA requires 'particular allegations which strongly imply Defendant[s'] contemporaneous knowledge that the statement was false when made.'" *Berson v. Applied Signal Technology Inc.*, 527 F.3d 982, 989 (9th Cir. 2008). As explained above, Plaintiff fails sufficiently to allege the falsity of any challenged statement.

Plaintiff notes other facts that he claims add to the inference of scienter, such as Intrexon's stock offerings, which he acknowledges is insufficient to show scienter. *See Anderson v. Peregrine Pharms., Inc.*, 2016 WL 3212258 (9th Cir. June 8, 2016) (declining to find defendants' attempts at securing capital to support an inference of scienter). He also notes Mr. Krishnan's resignation, but alleges no facts that show the resignation was accompanied by suspicious circumstances. "[A]bsent allegations that the resignation at issue was uncharacteristic . . . or was accompanied by suspicious circumstances," the inference of a suspicious change in personnel will never be as cogent or as compelling as the inference of a benign one. *Zucco*, 552 F.3d at 1002. Finally, he relies on three witness accounts, which are lacking in detail and fail to establish personal knowledge and reliability. *See Zucco*, 552 F.3d at 996-98. None of the three witnesses had any contact with the individual defendants or claim to speak to their states of mind. Two of the witnesses were not employed during the class period and allege no information about the company during those years. CW3 does not criticize Intrexon's products at all. CW2 was a junior scientist who worked in one division who opined that UltraVector was a commodity product and CW1 was a scientist in a different division who offered a similar opinion and also stated that RheoSwitch did not work as intended in her case. As explained above, these opinions are insufficient to make the inference of a material misrepresentation and likewise fail to suggest scienter. Even considered holistically, the allegations in the complaint fail to support a strong inference of scienter.

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007), the Supreme Court explained that a "strong inference" of the required intent means that a complaint will

survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." As explained in *Zucco*, "[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." 552 F.3d at 991. At least at this juncture, even to the extent anything in the ACAC could be seen as an adequate allegation of a material misrepresentation or omission, Plaintiff has not pleaded facts to support a compelling inference that any such misrepresentations or omissions were the result of an intent to deceive. Just as plausible, such statements or omissions represent a contrary valuation of the technologies and collaborations or a failure to analyze business conditions correctly.

### 3. Loss Causation

"Loss causation" refers to a plaintiff's obligation in a securities fraud action to establish "a causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The loss causation requirement was codified in the PSLRA: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages. 15 U.S.C. § 78u–4(b)(4) (emphasis added). To establish loss causation, Plaintiff must allege that Intrexon's stock declined because of a "corrective disclosure" that revealed to the market the "truth" of the alleged misstatements. *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (citing *Meyer v. Greene*, 710 F.3d 1189, 1192–93 (11th Cir. 2013)).

Here, the absence of an adequate pleading of material misstatements or omissions necessarily means Plaintiff has not alleged sufficient facts to show loss causation. In any event, Plaintiff fails to show how the Spotlight report constitutes a corrective disclosure. "The mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure." *In re Herbalife, Ltd. Sec. Litig.*, No. CV 14-2850, 2015 WL

1245191, at *5 (C.D. Cal. Mar. 16, 2015); *see also Meyer*, 710 F.3d at 1199 ("[I]f the information relied upon in forming an opinion was previously known to the market, the only thing actually disclosed to the market when the opinion is released is the opinion itself, and such an opinion, standing alone, cannot 'reveal[ ] to the market the falsity' of a company's prior factual representations.") Plaintiff argues that the Spotlight report discloses more than an opinion. Yet, the report states that it "expresses our research opinions, which we have based upon interpretation of certain facts and observations, all of which are based on publicly available information." ACAC, Ex. A at 29. The report does not "reveal to the market something previously hidden or actively concealed." *In re Herbalife*, at *5 n. 9. Throughout the report, Spotlight clearly attributes its findings to public filings, websites and other publicly available documents. Because the Spotlight report "only collected and opined on already public information, it does not constitute disclosure of 'the truth' as required for a corrective disclosure." *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 U.S. Dist. LEXIS 119194 (N.D. Cal. Sept. 2, 2016). Thus, Plaintiff fails adequately to plead loss causation.

B. Count II—Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act makes certain "controlling" individuals liable for violations of Section 10(b) and its underlying regulations. There is no dispute that any liability under Section 20(a) in this action is dependent on the existence of an underlying violation of Section 10(b). In view of the dismissal of the 10(b) claim, this count must also be dismissed.

## V. CONCLUSION

The motion to dismiss is granted with leave to amend. Any amended complaint shall be filed within 30 days of the date of this order.

**IT IS SO ORDERED**.

Dated: February 24, 2017

_____
RICHARD SEEBORG
United States District Judge

ORDER RE: MOTION TO DISMISS
CASE NO. 16-cv-02398-RS

14